Slip Op. 19-161

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

TRIMIL S.A,

              Plaintiff,

        v.

UNITED STATES,

              Defendant.

</td><td>

:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:

</td><td>

Before: Richard K. Eaton, Judge

Court No. 16-00025

</td></tr>
</table>

## OPINION

[Plaintiff's motion for summary judgment is granted; Defendant's cross-motion for summary judgment is denied.]

Dated: December 17, 2019

*Robert B. Silverman*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, of New York, NY, argued for Plaintiff. With him on the brief were *Robert F. Seely* and *Alan R. Klestadt*.

*Jamie L. Shookman*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for Defendant. With her on the brief were *Chad A. Readler*, Acting Assistant Attorney General and *Amy M. Rubin*, Assistant Director. Of Counsel on the brief was *Chi S. Choy*, Office of the Assistant Chief Counsel, U.S. Customs and Border Protection.

Eaton, Judge: Plaintiff Trimil S.A. ("Plaintiff" or "Trimil"), an importer of Giorgio Armani

S.p.A. ("Armani") apparel, appeals from U.S. Customs and Border Protection's ("Customs")

denial of its protest regarding twelve entries of clothing[1] imported from Italy and Hong Kong.

---

[1]	This action arose as a test case, under which thirty-one cases are suspended, pending decision. *See Trimil S.A. v. United States*, Ct. No. 10-00378, ECF No. 39. The twelve entries at issue here were severed from *Trimil S.A. v. United States*, Court No. 10-00378. *See* Ct. No. 10-00378, ECF No. 27.

By its motion for summary judgment, Trimil challenges Customs' calculation of the transaction value[2] of the clothing, pursuant to 19 U.S.C. § 1401a. *See* Pl.'s Mem. Supp. Mot. Summ. J., ECF No. 23, 1 ("Pl.'s Br."); Pl.'s Resp. Def.'s Cross-Mot. Summ. J., ECF No. 36 ("Pl.'s Resp."). Specifically, Trimil objects to Customs' inclusion, in transaction value, of the amounts of advertising fees and trademark royalty fees, that Trimil paid to third parties. *See* Compl., ECF No. 2, ¶¶ 19, 20, 22. The addition of these fees to the clothing's transaction value increased the amount of Trimil's duties.

Defendant the United States ("Defendant" or the "Government") cross-moves for summary judgment, contending that the advertising fees and trademark royalty fees paid by Trimil fall under transaction value either as part of "the price actually paid or payable" for the imported merchandise, or as a statutorily authorized addition that was paid as a condition of sale. *See* 19 U.S.C. § 1401a(b)(1), (D) (2012)[3]; Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. & Supp. Def.'s Cross-Mot. Summ. J., ECF No. 28, 1 ("Def.'s Br."); Def.'s Reply, ECF No. 41.

The court has jurisdiction under 28 U.S.C. § 1581(a) (2012). *See* Compl. ¶ 13; Answer, ECF No. 5, ¶ 13. The court finds that (1) Plaintiff properly conceded the design fees as a dutiable assist added to price actually paid or payable; (2) the advertising fees are not dutiable because they are neither part of price actually paid or payable, nor do they fit within a statutory addition to price;

---

[2]     Defendant at no point asserts that transaction value is inappropriate in this case because of the relationships among the parties. To the contrary, the Government insists that transaction value is the appropriate way to value Plaintiff's entries. *See* Def.'s Br. 19 ("The parties agree that 'transaction value' is the appropriate method for valuing the goods at issue.").

[3]     Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code, 2012 edition. For ease of reference, citations to Customs' regulations are to the 2019 edition. The pertinent parts of both statutes and regulations are identical in substance to the versions in effect at the time of importation.

and (3) the trademark royalty fees are not dutiable because they are neither part of price actually

paid or payable, nor do they fit within a statutory addition to price.


# BACKGROUND

## I.      Customs' Transaction Value Determination

Trimil is an importer of wearable apparel bearing the trademarks of Mani, Armani

Collezioni, and Armani Jeans. *See* Pl.'s Br. Ex. 2, ECF No. 23-2, Ballestrazzi Aff. ¶ 5; Pl.'s Stmt.

Material Facts, ECF No. 23, ¶¶ 1, 4, 5 ("Pl.'s SMF"). Confezioni di Matelica S.p.A. ("Vendor

Matelica") and Deanna S.p.A. ("Vendor Deanna") (collectively, the "seller-manufacturers")

manufactured Trimil's orders of Armani-trademarked merchandise.[4] Pl.'s SMF ¶¶ 6, 7.

Trimil imported twelve entries[5] of Armani-trademarked apparel between 2008 and 2009.

*See* Pl.'s SMF ¶ 4. The company paid an amount based on its estimation of the duties it would owe

Customs at the time of entry based on the invoice price of the clothing together with additional

amounts for design fees,[6] advertising fees, and trademark royalty fees that it had paid to Armani

---

[4]      Armani has an ownership interest in Trimil S.A., Vendor Matelica, and Vendor
Deanna. Trimil S.A. is a joint venture between Armani and Ermengildo Zegna Corp., an unrelated
entity. Pl.'s SMF ¶ 12. Armani wholly owns Vendor Deanna, and has an ownership interest in
Vendor Matelica. Vendor Matelica is wholly owned by Trimil S.p.A., a sister company of Trimil
S.A. *See* Pl.'s Br. Ex. 3, ECF No. 23-4, Ballestrazzi Dep. at 36:10-:25, 37:16-38:6.

[5]      The total number of entries included merchandise purchased from an additional
seller-manufacturer, Vendor Moda. No duties were paid on the advertising fees or trademark
royalty fees for the Vendor Moda clothing at the time of entry. Therefore, the duties later paid at
reconciliation for these entries are not before the court. *See* Pl.'s Resp. 1 n.2 ("[Trimil]
acknowledges defendant's claim that the court has no jurisdiction over three of the twelve
summonsed entries because the importer deposited no duties for the subject fees on those entries
[*at the time of entry*].").

[6]      Trimil does not contest the dutiability of the design fees in this action. *See* Pl.'s
SMF ¶¶ 53, 54.

and Armani's subsidiary, G.A. Modefine S.A. ("Modefine"). *See* Ballestrazzi Aff. ¶¶ 5, 10, 11,

15, 16; Pl.'s SMF ¶ 51.

Customs determined the dutiable transaction value of Trimil's imported merchandise based

on Trimil's declarations as to value and payment of its estimated duties. *See* Pl.'s Br. Ex. 1, ECF

No. 23-1, Bassani Aff. ¶¶ 29-33; Def.'s Br., ECF No. 28-3, Ex. 3.

Trimil later paid its duties in full through reconciliation entries.[7] Pl.'s SMF ¶¶ 8, 9, 53.

Customs continued to include the advertising fees and trademark royalty fees in its final calculation

of transaction value. Pl.'s SMF ¶¶ 47, 50.

On July 22, 2010, Trimil timely filed a protest covering the twelve entries. *See* Def.'s Br.,

ECF No. 28-3, Ex. 5. Customs denied the protest on September 24, 2010. *See* Def.'s Br. Ex. 5.

On May 12, 2016, Trimil commenced this litigation arguing that the total invoice price

paid to the seller-manufacturers, less the advertising fees and trademark royalty fees, represents

the total price of the imported merchandise, and therefore also represents the dutiable transaction

value. *See* Compl.; Pl.'s SMF ¶ 19.


**II.     Agreements Governing the Disputed Advertising Fees and Trademark Royalty Fees**

Trimil entered into two sets of agreements with Armani and Armani's subsidiary Modefine.

Trimil entered into the first set of agreements, consisting of two design and advertising agreements,

with Armani. *See* Pl.'s Br. Ex. 2 ("Design & Advertising Agreements"); *see also* Pl.'s SMF ¶ 39.

At the same time, Trimil entered into the second set of agreements, consisting of two trademark

---

[7]     Reconciliation refers to the importer-initiated process under which undetermined
elements of an entry "are provided to the Customs Service at a later time. A reconciliation is treated
as an entry for purposes of liquidation, reliquidation, recordkeeping, and protest." 19 U.S.C.
§ 1401(s).

licensing agreements, with Modefine.[8] *See* Pl.'s Br. Ex. 2 ("Trademark Agreements"); *see also* Pl.'s SMF ¶ 30. By the terms of the four agreements (collectively, the "Agreements"), Trimil was a design, advertising, and trademark licensee of Armani. *See* Pl.'s Br. Ex. 3, ECF No. 23-4, Ballestrazzi Dep. at 35:4-36:4. The Agreements were entered into prior to the manufacture of the imported merchandise. Pl.'s SMF ¶¶ 30, 39.

One of the two Design & Advertising Agreements provided stylistic and advertising assistance for the Mani- and Armani Collezioni-trademarked clothing, and the other provided assistance for the Armani Jeans-trademarked clothing. Pl.'s SMF ¶¶ 39, 40. The purpose of these contracts was to "enhance retail sales of the trademarked merchandise within the United States." Pl.'s SMF ¶ 41. Under each agreement, Trimil paid two separate fees to Armani—a design fee and an advertising fee. These fees were equal to a percentage of the net revenue of Trimil Corp. (Trimil S.A.'s U.S. subsidiary), or, in the alternative, a guaranteed minimum fee for both design and advertising. Pl.'s SMF ¶ 42. The calculation of these payments to Armani was based on Trimil Corp.'s future U.S. sales of the imported clothing. Pl.'s SMF ¶ 46.

As to the Trademark Agreements, one agreement covered the Mani and Armani Collezioni trademarks, and the other covered the Armani Jeans trademarks. Pl.'s SMF ¶ 30. The purpose of these agreements was to "provide[] Trimil SA with a license to manufacture, purchase, and to sell the Armani-trademarked merchandise in the United States." Ballestrazzi Aff. ¶ 12. Under these

---

[8]      The relevant sections of the two Design & Advertising Agreements are substantially identical, and are treated as such by the parties. *See* Pl.'s SMF ¶¶ 39-46; Def.'s Resp. Pl.'s Stmt. Material Facts, ECF No. 28-1, ¶¶ 39-46 ("Def.'s Resp. Pl.'s SMF"). Likewise, the relevant sections of the two Trademark Agreements are substantially identical. *See* Pl.'s SMF ¶¶ 30-38; Def.'s Resp. Pl.'s SMF ¶¶ 30-38. For ease of reading, the identical sections are referenced collectively as sections of the "Design & Advertising Agreements" and the "Trademark Agreements," respectively.

two agreements, Trimil paid Modefine trademark royalty fees. Pl.'s SMF ¶ 31. As with the Design & Advertising Agreements, the calculation of these payments to Modefine was based on Trimil Corp.'s future U.S. sales. Pl.'s SMF ¶¶ 38, 46. The Trademark Agreements also provided "a guaranteed minimum trademark royalty amount." *See* Pl.'s SMF ¶ 31.

Trimil concedes that the design fees it paid pursuant to the Design & Advertising Agreements are properly part of the clothing's transaction value as a dutiable assist under 19 U.S.C. § 1401a(b)(1)(C). *See* Pl.'s SMF ¶¶ 53, 54; Bassani Aff. ¶ 35 (characterizing the design fees as "assists"). Accordingly, Trimil only contests the dutiability of advertising fees and trademark royalty fees.

Failure to comply with the terms of the Design & Advertising Agreements by Trimil would be grounds for Armani to terminate them. *See* Design & Advertising Agreements, § 12(3)(IV). Likewise, Trimil's failure to make royalty payments to Modefine would be grounds for Modefine to terminate the Trademark Agreements. *See* Trademark Agreements, § 16(3). Further, if Trimil failed to maintain its status as a trademark licensee under the Trademark Agreements, Armani could terminate the Design & Advertising Agreements. *See* Design & Advertising Agreements, § 12(3)(VII) ("Armani may also terminate this contract . . . if, for any reason, [Trimil] ceases to be a licensee of the 'Armani' Trademark.").

**STANDARD OF REVIEW**

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." U.S. Ct. Int'l Tr. R. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The court reviews de novo Customs' denial of protests. *See, e.g.*, *LDA Incorporado v. United States*, 39 CIT __, __, 79 F. Supp. 3d 1331, 1338 (2015) (citing 28 U.S.C. § 2640(a)(1)).

## LEGAL FRAMEWORK

Whenever possible, Customs appraises imported merchandise on the basis of its "transaction value." *See* 19 U.S.C. § 1401a(a)(1)(A). Transaction value is "the price actually paid or payable for the merchandise when sold for exportation to the United States," plus a limited number of fact-dependent additions. *Id.* § 1401a(b)(1)(A)-(E) (emphasis added) ("The price actually paid or payable for imported merchandise shall be increased by the amounts attributable to the items (*and no others*) described in subparagraphs (A) through (E) only to the extent that each such amount (i) is not otherwise included within the price actually paid or payable; and (ii) is based on sufficient information.").[9]

---

[9]      The transaction value of imported merchandise is the price actually paid or payable for the merchandise when sold for exportation to the United States, plus amounts equal to--

(A) the packing costs incurred by the buyer with respect to the imported merchandise;
(B) any selling commission incurred by the buyer with respect to the imported merchandise;
(C) the value, apportioned as appropriate, of any assist;
(D) any royalty or license fee related to the imported merchandise that the buyer is required to pay, directly or indirectly, as a condition of the sale of the imported merchandise for exportation to the United States; and
(E) the proceeds of any subsequent resale, disposal, or use of the imported merchandise that accrue, directly or indirectly, to the seller.

The price actually paid or payable for imported merchandise shall be increased by the amounts attributable to the items (*and no others*) described in subparagraphs (A) through (E) only to the extent that each such amount (i) is not otherwise included within the price actually paid or payable; and (ii) is based on sufficient information. If sufficient information is not available, for any reason, with respect to any amount referred to in the preceding sentence, the transaction value of the

The statute defines the term "price actually paid or payable" as

> the total payment (whether direct or indirect, and exclusive of any costs, charges, or expenses incurred for transportation, insurance, and related services incident to the international shipment of the merchandise from the country of exportation to the place of importation in the United States) made, or to be made, for imported merchandise by the buyer to, or for the benefit of, the seller.

*Id.* § 1401a(b)(4)(A).

One of the statutorily permitted increases to the price actually paid or payable under § 1401a(b) is the inclusion of "the value, apportioned as appropriate, of any assist." *Id.* § 1401a(b)(1)(C); *see also* 19 C.F.R. § 152.103(d) (2019) (regulating valuation of assists).[10] An "assist" may be a particular item or service "supplied directly or indirectly, and free of charge or at reduced cost, by the buyer of imported merchandise for use in connection with the production or the sale for export to the United States of the merchandise." 19 U.S.C. § 1401a(h)(1)(A). The assist itself may take the form of items such as "[m]aterials, components, parts, and similar items" or planning aids such as "[e]ngineering, development, artwork, design work, and plans and sketches that are undertaken elsewhere than in the United States and are necessary for the

---

imported merchandise concerned shall be treated, for purposes of this section, as one that cannot be determined.

19 U.S.C. § 1401a(b)(1) (emphasis added).

[10]    Customs' regulation on assists provides that, where the assist is "produced by the buyer or a person related to the buyer," and "the assist consist[s] of materials, components, parts, or similar items incorporated in the imported merchandise, or items consumed in the production of the imported merchandise, . . . [or] of tools, dies, molds, or similar items used in the production of the imported merchandise," the value of the assist is "the cost of its production," plus transportation costs. 19 C.F.R. § 152.103(d)(1)-(2). Here, Customs accepted the amount Trimil paid in design fees to Armani as the value of the assists that Armani provided. *See* Pl.'s SMF ¶ 54; Def.'s Br. 17; *see, e.g.*, Customs Ruling Letter, HQ 544088 (Mar. 25, 1988) ("[C]ommissions which will be paid to the other Hong Kong corporation for design work and design consulting services are to be treated as assists and included in the calculation of transaction value.").

production of the imported merchandise." *Id.* § 1401a(h)(1)(A)(i), (iv). Importantly, the value of

any designs made in the United States is not dutiable. *See* 19 C.F.R. § 152.103(d) ("[D]esign work

undertaken in the U.S. may not be added to the price actually paid or payable [as an assist].").

Transaction value may also include, as a statutory addition, "any royalty or license fee

related to the imported merchandise that the buyer is required to pay, directly or indirectly, as a

condition of the sale of the imported merchandise for exportation to the United States." 19 U.S.C.

§ 1401a(b)(1)(D). In other words, not all royalties and license fees are dutiable—only those that

are *conditions* of the sale for exportation. Under the accompanying regulation,

> [r]oyalties or license fees paid to third parties for use, in the United States, of
> copyrights and trademarks related to the imported merchandise generally will be
> considered selling expenses of the buyer and not dutiable. The dutiable status of
> royalties or license fees paid by the buyer will be determined in each case and will
> depend on (1) *whether the buyer was required to pay them as a condition of sale of
> the merchandise for exportation to the United States*, and (2) to whom and under
> what circumstances they were paid. Payments made by the buyer to a third party
> for the right to distribute or resell the imported merchandise will not be added to
> the price actually paid or payable for the imported merchandise *if the payments are
> not a condition of the sale of the merchandise for exportation to the United States*.

19 C.F.R. § 152.103(f) (emphasis added).


## DISCUSSION

Each of the fees paid by Trimil to Armani or Modefine, to be dutiable, must fit within the

statute. If a payment is not part of the price actually paid or payable, it will only be part of

transaction value if it is one of the five additions in § 1401a(b)(1)(A)-(E), since "*no others*" may

be included. *See* 19 U.S.C. § 1401a(b)(1). A clear example of a dutiable addition is an "assist,"

such as the design fees that Trimil paid to Armani. The dutiability of the design fees is undisputed.

Nonetheless, the court discusses assists as an example of a payment that meets the statute's narrow

requirements.

I.      **Plaintiff Properly Conceded the Dutiability of the Design Fees, Which Are an Assist Added to Transaction Value**

Trimil conceded, in its Complaint, that the design fees it paid to Armani under the Design & Advertising Agreements were part of the transaction value of the imported merchandise. *See* Compl. ¶ 15; Pl.'s SMF ¶¶ 53, 54.

As noted, an "assist," for the purposes of transaction value, can be "[m]aterials [or] design work . . . supplied directly or indirectly, and free of charge or at reduced cost, by the buyer of imported merchandise for use in connection with the production or the sale for export to the United States of the merchandise." 19 U.S.C. § 1401a(h)(1)(A)(i), (iv). Trimil (the buyer) entered into agreements with (and paid fees to) Armani to obtain Armani's "stylistic assistance and consulting services." *See, e.g.*, Design & Advertising Agreements § 4(1). For its part, Armani facilitated the production of the clothing by "creating models; . . . seeking out and choosing fabrics and materials to be used in manufacturing the Products; . . . examining the first prototypes . . . and providing instructions for any corrections; . . . [and granting] final approval of the prototypes." Design & Advertising Agreements § 4(1)(a)-(d). Trimil then was able to provide, directly or indirectly, these assists to the seller-manufacturers, Vendor Matelica and Vendor Deanna, which manufactured the clothing to be imported. *See* Pl.'s SMF ¶¶ 6, 7, 40 ("These agreements required Armani SpA to . . . provide apparel designs for the seasonal 'collections' that Trimil SA would have produced for sale within the United States."). Trimil did not charge the seller-manufacturers for the designs it had paid for and obtained from Armani. *See* Pl.'s SMF ¶ 19; Def.'s Resp. Pl.'s SMF ¶ 19.

Thus, Trimil (the buyer) paid for models and design guidance from Armani, whose work was performed in Italy, and then supplied it to the seller-manufacturers at no additional cost beyond the invoice price of its orders. The models, fabric selections, and other design components were

used in connection with the production of merchandise later exported to the United States. These activities constituted assists because they were undertaken outside the United States, and were provided by the buyer to the seller at no cost for use in manufacturing the clothing. Therefore, there can be little doubt that the design fees are appropriately included in transaction value as a statutory addition (an assist) under 19 U.S.C. § 1401a(b)(1)(C).

## II.     The Advertising Fees Paid to Armani Are Not Part of Transaction Value, and Are Therefore Not Dutiable

Pursuant to the same agreements under which it paid the design fees, Trimil paid advertising fees to Armani. Pl.'s SMF ¶ 39. Armani agreed that it would "adequately advertise, or cause to be adequately advertised [in the United States], the Products and/or the Trademark they display," as well as agreeing with Trimil on themes for the advertisements, designating media and places for the advertisements, and carrying out public relations activities. *See* Design & Advertising Agreements, §§ 2(15), 3, 5(1)-(3); *see also* Pl.'s Br. 7 ("The advertising fees related only to post-importation marketing of merchandise within the United States.").

Plaintiff contends that the advertising fees under the Design & Advertising Agreements fall squarely within the context of post-import transactions, and are thus not part of the dutiable transaction value. *See* Pl.'s Br. 12. For Trimil, two facts—that the advertising fees, paid to Armani, were based on the revenue from Trimil's post-importation sales in the United States, and that the advertising services were directed to the U.S. market—show that the advertising fees are not part of the price actually paid or payable for the imported merchandise. Pl.'s Br. 15 ("The advertising fees were paid to increase U.S. consumer recognition and appreciation of the Armani brand and were directly related to U.S. retail sales.").

In support of its argument, Trimil cites Customs' transaction value regulation, and several Customs rulings involving marketing or advertising fees that were found non-dutiable. *See* Pl.'s Br. 12-13 (citations omitted); *see, e.g.*, 19 C.F.R. § 152.103(a)(2) (emphasis added) ("Activities such as advertising, undertaken by the buyer on his own account . . . *will not be considered an indirect payment to the seller though they may benefit the seller*. The costs of those activities will not be added to the price actually paid or payable in determining the customs value of the imported merchandise.").

For Defendant, the advertising fees should be included in transaction value *either* as part of the price actually paid or payable for the imported merchandise, or as a statutory addition to price under one of the enumerated categories in 19 U.S.C. § 1401a(b). *See* Def.'s Br. 13-14. It makes this argument even though the fees were not paid to the seller-manufacturers. Rather, Defendant finds it significant that "Armani negotiated these services along with its design services — and calculated fees for both in an identical manner —as part of an 'overall strategy' to ensure 'brand integrity.'" Def.'s Br. 21; *see* Ballestrazzi Dep. at 75:4-:10 ("[W]e need to ensure that the brand is promoted and advertised in a way which is consistent with the overall strategy, brand -- integrity and strategy of the brand. So typically, the advertising and design are coordinated."). Defendant emphasizes the relationship between the payment of the advertising fees—and thus the continuation of the various agreements in full force and effect—and Trimil's ability to order and import Armani clothing. *See* Def.'s Br. 21 ("[B]y paying the advertising fees at issue, Trimil S.A. ensured that the Design and Advertising Assistance Agreements remained in effect, pursuant to which Trimil S.A. acquired rights to the designs used to produce the imported merchandise.").

Despite Defendant's arguments, the advertising fees are not dutiable because they fall outside the statute. The statutory language is clear. If a payment is neither part of the price actually

paid or payable, nor one of the five, specified additions to price, that payment is not part of transaction value. *See* 19 U.S.C. § 1401a(b)(1) (emphasis added) ("The transaction value of imported merchandise is the price actually paid or payable for the merchandise when sold for exportation to the United States, plus . . . the amounts attributable to the items (*and no others*) described in subparagraphs (A) through (E) . . . ").

The statute defines "price actually paid or payable" as "the total payment . . . made, or to be made, for imported merchandise by the buyer to, or for the benefit of, the seller." 19 U.S.C. § 1401a(b)(4)(A). The words "made . . . for imported merchandise by the buyer to, or for the benefit of, the seller," are important. The advertising fees are not part of the price actually paid or payable because they were not paid to, or for the benefit of the seller. *See id.*

The parties agree that the fees were not paid *to* the seller-manufacturers; they disagree as to whether the fees were paid *for the benefit of* the seller-manufacturers. *See* Pl.'s SMF ¶ 19; Def.'s Resp. Pl.'s SMF ¶ 19 ("[T]he price that Trimil S.A. paid the vendor was the only amount paid directly . . . to the vendors, but . . . the vendors also benefited from the . . . advertising fees that Trimil S.A. paid in relation to the subject merchandise."). Defendant contends that the benefit to the seller-manufacturers, Vendor Matelica and Vendor Deanna, occurred because Trimil's payment of the advertising fees to Armani enabled the seller-manufacturers to engage in the production of the goods for exportation. *See* Def.'s Br. 23-24 ("If [the Design & Advertising] agreements were terminated, the [seller-manufacturers] would be prohibited from manufacturing products based on the designs provided by Armani. . . . And, without the ability to manufacture Armani products, the [seller-manufacturers] could not make or sell the subject merchandise."). Put another way, for Defendant, had the Design & Advertising Agreements not been in place, Trimil could not have placed its order with the seller-manufacturers.

This argument, however, seeks to cast the net of "benefit" too far. The Customs regulation interpreting price actually paid or payable makes clear that "benefit" has a narrow meaning, especially as to "indirect" payments. *See* 19 C.F.R. § 152.103(a)(2) (emphasis added) ("An indirect payment would include the settlement by the buyer, in whole or in part, of a debt owed by the seller, or where the buyer receives a price reduction *on a current importation* as a means of settling a debt owed him by the seller."). The same regulation also explicitly excludes advertising services from dutiable "indirect" payments:

> Activities such as advertising, undertaken by the buyer on his own account, other than those for which an adjustment is provided in § 152.103(b) [and 19 U.S.C. § 1401a(b)(1)(A)-(E)], *will not be considered an indirect payment to the seller though they may benefit the seller*. The costs of those activities will not be added to the price actually paid or payable in determining the customs value of the imported merchandise.

19 C.F.R. § 152.103(a)(2) (emphasis added).

Here, there is no real dispute as to the purpose of the Design & Advertising Agreements, or the entities that were bound to perform the obligations under those agreements. Armani wanted to control the manner in which its products were advertised in the United States, and Trimil wanted to bring Armani's clothing into the United States and sell it. Thus, the obligations and benefits under the Design & Advertising Agreements accrued to Armani (payment, uniform advertising) and Trimil (ability to purchase and resell the clothing). The advertising fees were paid as part of the larger enterprise, but were aimed at resale of the clothing in the U.S. market. Any benefit the seller-manufacturers received from the transaction—*i.e.*, Trimil's ability to place its order with them—is so tangential to the fees paid to Armani for advertising as to be unquantifiable (if it exists at all). Thus, the advertising fees paid by Trimil to third parties are not part of the price actually paid or payable by Trimil as buyer to the seller-manufacturers.

If the advertising payments are not part of the price actually paid or payable, they will only be dutiable if they fall within one of the five statutory additions defined by 19 U.S.C. § 1401a(b)(1)(A)-(E). None of the five statutory additions listed under § 1401a(b)(1)(A)-(E) describe advertising or advertising fees. To the extent that the parties refer to the advertising fees as *license* fees, there is no reason to follow this characterization when the regulation has explicitly distinguished advertising fees from dutiable license fees associated with intellectual property rights. *See* 19 C.F.R. § 152.103(a)(2), (f). Moreover, the advertising and other promotional services occurred exclusively in the United States, after importation. *See, e.g.*, Pl.'s Br. Ex. 4, ECF No. 23-5 (showing invoices for advertising and other promotional services between Armani and various U.S. entities). The advertising services were associated with Trimil Corp.'s U.S. sales, not the transaction between Trimil and the seller-manufacturers. Thus, the advertising fees are not one of the statutorily permitted additions to transaction value. *See* 19 U.S.C. § 1401a(b)(1) (emphasis added) ("The price actually paid or payable for imported merchandise shall be increased by the amounts attributable to the items (*and no others*) described in subparagraphs (A) through (E) . . .").

Accordingly, because the advertising fees paid by Trimil to Armani are not part of the price actually paid or payable to the seller-manufacturers, and do not fall within one of the limited additions to price defined in the transaction value statute, Customs should have excluded them from its calculation of transaction value.

III.    **Because the Trademark Royalty Fees Were Not Paid as a Condition of Sale, They Are Not Part of Transaction Value, and Are Therefore Not Dutiable**

Defendant next seeks to include in transaction value the trademark royalty fees, paid pursuant to the two Trademark Agreements.

First, Defendant argues that the trademark royalty fees are part of the price actually paid or payable because they were paid by the buyer (Trimil) for the benefit of the seller-manufacturers (Vendor Matelica and Vendor Deanna). Pointing to provisions in the Trademark Agreements similar to those it highlighted in the Design & Advertising Agreements, Defendant contends that, without Trimil's payment of the trademark royalty fees to Modefine, the seller-manufacturers would not have been able to produce the clothing at issue. *See* Def.'s Br. 28-29 (quoting Ballestrazzi Dep. at 77:14-78:2) (explaining that, since the Design & Advertising Agreements also required that Trimil be a trademark licensee of Armani's, both sets of agreements would be terminated if Trimil failed to pay the trademark royalty fees, and "if these agreements were terminated, 'Trimil S.A. would have an obligation to direct its manufacturers to terminate any ongoing production.'"). Defendant concludes that, "[b]ecause the right to make and sell the imported merchandise depended on these agreements, the trademark royalties that Trimil S.A. paid to keep them in effect were made for the benefit of the [seller-manufacturers]." Def.'s Br. 29.

This argument fails, just as it did with respect to the advertising fees. "Benefit" has a narrow meaning within the transaction value statute and the regulation interpreting "price actually paid or payable," and merely because the fees are paid as part of a series of agreements that touch on all parts of the larger transaction resulting in eventual sale of the clothing in the United States does not somehow make the seller-manufacturers beneficiaries of Trimil's payment under the Agreements. As with the advertising fees, Trimil paid the fees to third party Armani, and all of the rights and obligations under the contracts accrued to or were performed by the actual parties to the contracts. Again, Trimil's right to affix Armani trademarks, and resell the clothing in the United States as Armani-trademarked products, provides no quantifiable benefit to the seller-manufacturers from the trademark royalty fees paid. The claimed benefit—placement of an order

by Trimil with the seller-manufacturers—is too far removed from the payment of the trademark

royalty fees to Modefine to make them part of the price actually paid or payable to the seller-

manufacturers. *See* 19 C.F.R. § 152.103(a)(2) ("An indirect payment would include the settlement

by the buyer, in whole or in part, of a debt owed by the seller, or where the buyer receives a price

reduction on a current importation as a means of settling a debt owed him by the seller.").

Moreover, Defendant has not shown, from the text of the Trademark Agreements, that the

fee payments were *for the current shipments of imported merchandise itself*. Rather, the Trademark

Agreements provide a fee schedule covering the period of time between Spring/Summer 2007 and

Autumn/Winter 2010-2011. *See* Trademark Agreements, § 16(1). This period of time would,

presumably, include numerous instances of exportation to the United States, and, for this entire

period, Trimil was permitted to use Armani's trademarks. *See* Trademark Agreements, §§ 3, 16(1).

"Price" here must be the "price actually paid or payable *for the merchandise* when sold for

exportation to the United States." 19 U.S.C. § 1401a(b)(1) (emphasis added). In other words, the

fees Defendant wishes to be added to the transaction value would apply equally to any similar

entries, made while the Trademark Agreements were in effect, whose case is suspended under this

test case. The "current importation" language leaves no room for fees covering trademark use in

the production of merchandise to be exported in multiple, discrete shipments. *See* 19 C.F.R.

§ 152.103(a)(2) ("An indirect payment would include . . . where the buyer receives a price

reduction on a current importation as a means of settling a debt owed him by the seller.").

Alternatively, Defendant urges the court to find that the trademark royalty fees should be

added to price as a statutory addition. Royalty fees such as those at issue here are explicitly listed

as one of the possible statutory additions to price in the transaction value statute. *See* 19 U.S.C.

§ 1401a(b)(1)(D). Such additions may only be included in transaction value, however, if the

"amount (i) is not otherwise included within the price actually paid or payable; and (ii) is based on sufficient information." *Id.* § 1401a(b)(1). In its brief, Defendant argues that, if the court finds that the contested fees are not part of the price actually paid or payable, the fees are nonetheless dutiable because they are royalty or license fees paid as a condition of sale of the imported merchandise.

Plaintiff, on the other hand, says that the trademark royalty fees are not dutiable because they were not paid as a condition of sale, but rather were a selling expense associated with the clothing's resale value after importation into the United States. For Plaintiff, "the trademark royalty is by its nature . . . a selling expense of the buyer that has not been made a condition of sale for exportation of the merchandise imported. Therefore, the royalties in question cannot form part of dutiable value." Pl.'s Br. 20 (emphasis omitted).

Under the statute, transaction value may include "any royalty or license fee related to the imported merchandise that the buyer is required to pay, directly or indirectly, *as a condition of the sale of the imported merchandise for exportation to the United States*." 19 U.S.C. § 1401a(b)(1)(D) (emphasis added). The transaction value regulation, 19 C.F.R. § 152.103, states that

> [r]oyalties or license fees paid to third parties for use, in the United States, of copyrights and trademarks related to the imported merchandise generally will be considered selling expenses of the buyer and not dutiable. The dutiable status of royalties or license fees paid by the buyer will be determined in each case and will depend on (1) *whether the buyer was required to pay them as a condition of sale of the merchandise for exportation to the United States*, and (2) to whom and under what circumstances they were paid. Payments made by the buyer to a third party for the right to distribute or resell the imported merchandise will not be added to the price actually paid or payable for the imported merchandise if the payments are not a condition of the sale of the merchandise for exportation to the United States.

19 C.F.R. § 152.103(f) (emphasis added).

A central inquiry here, is whether the trademark royalty fees paid by Trimil were a condition of the sale for exportation of the entries at issue to the United States. Defendant points out that "Trimil S.A. provides no authority for its assertion that conditions of sale must be expressly

contained in 'terms of the relevant sales contract and licensing agreement.'" Def.'s Br. 40. The transaction value regulation, however, indicates that the question is "whether the buyer was *required to pay* [the trademark royalty fees] *as a condition of sale of the merchandise for exportation to the United States*." 19 C.F.R. § 152.103(f) (emphasis added). Defendant itself provides no evidence of a clear *requirement* that the fees be paid *for* exportation, rather, it infers a condition from its own interpretation of the Trademark Agreements. The Trademark Agreements govern the payment of the trademark royalty fees.

The "Termination" section of these agreements states that Modefine "*may also terminate this Agreement at any time . . .* if [Trimil] violates any of the obligations provided for in any of the following Clauses," including payment of fees. *See* Trademark Agreements, § 16(3)(VIII). Modefine's ability to cancel the agreements and halt production if Trimil did not pay the fees does not make the provision a condition of sale for exportation to the United States. *See* 19 C.F.R. § 152.103(f). The "Subject-matter" section of the Trademark Agreements provides only that Modefine "grants to [Trimil] the license to use the Licensed Trade Mark." *See* Trademark Agreements, § 3. It does not incorporate, by its terms, any requirements for the sale of the clothing for exportation to the United States. Under the transaction value regulation, "[r]oyalties or license fees paid to third parties for use, *in the United States*, of copyrights and trademarks *related to the imported merchandise* generally will be considered selling expenses of the buyer and *not dutiable*." 19 C.F.R. § 152.103(f) (emphasis added). Defendant has pointed to no part of any of the Trademark Agreements indicating that the payment of the trademark royalty fees was a condition for exportation of the clothing to the United States. Nor has it pointed to any other convincing evidence. That production would be halted were the trademark royalty fees not paid does not transform them into conditions of sale for exportation.

Therefore, since the trademark royalty fees are neither part of the price actually paid or payable, nor do they fit within one of the enumerated statutory additions in 19 U.S.C. § 1401a(b)(1)(A)-(E), Customs erred by including them in transaction value.

## CONCLUSION

Based on the foregoing, Plaintiff's motion for summary judgment is granted, and Defendant's cross-motion for summary judgment is denied. Judgment shall be entered accordingly.

$\underline{\hspace{2cm}\text{/s/ Richard K. Eaton}\hspace{1cm}}$
Richard K. Eaton, Judge

Dated:          December 17, 2019
                New York, New York